# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Polly O., | Case No. 20-cv-1820 (ECT/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

This matter is before the Court on Plaintiff Polly O.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 15) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant") Motion for Summary Judgment (Dkt. 17). Plaintiff is seeking judicial review of a final determination by the Social Security Administration denying her application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's Motion be granted in part, Defendant's Motion be denied, and that this case be remanded to the Commissioner consistent with this Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

Plaintiff filed an application seeking disability insurance benefits on November 13, 2017.  (R. 10, 165-66.)[1]  Plaintiff alleged a period of disability beginning November 5, 2012 due to a number of physical and mental impairments—including fibromyalgia, nerve root compression, a pinched nerve, neuropathy, chronic pain, depression, and anxiety.  (R. 76, 236.)  Plaintiff completed high school, earned a retail management certificate, and has work experience as a bank teller.  (R. 237-38.)  She was 53 years old when the Administrative Law Judge issued her decision.  (R. 21, 76.)

Plaintiff's application for disability insurance benefits was originally denied and then again denied upon reconsideration, and on July 9, 2019, Plaintiff requested a hearing before an administrative law judge.  (R. 27-58.)  Administrative Law Judge Amy Budney ("ALJ") held a hearing with Plaintiff, who was represented at the hearing by Attorney Benjamin Lundquist, on July 8, 2019.  (R. 10.)

On August 27, 2021, the ALJ rendered an unfavorable decision against Plaintiff. (R. 10-21.)  In making this determination, the ALJ followed the five-step sequential evaluation process pursuant to 20 C.F.R. § 404.1520(a).  At the first step, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from the alleged onset date.  (R. 12.)  At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "degenerative disc disease of the lumbar and thoracic spine; functional neurological symptom disorder; history of breast cancer with double mastectomy (2008), status-post chemoradiation therapy; spondylosis cervical and lumbar;

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 14.

spondylolisthesis lumbosacral; degenerative arthritis of the bilateral hips; pain disorder; bilateral carpal tunnel syndrome, mild; bilateral thumb basal joint arthritis; left index and middle trigger finger." (R. 12.) The ALJ also concluded that "claimant's medically determinable mental impairments of depressive disorder, adjustment disorder, and anxiety disorder did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (R. 13.) The ALJ also found that Plaintiff's dyssynergic defecation[2] was nonsevere. (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CPR Part 404, Subpart P, Appendix 1. (R. 14.)

The ALJ then assessed Plaintiff with the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following. The claimant can sit for 1 hour at a time for a total of 6 hours. The claimant can stand 30 minutes at a time for a total of 4 hours. The claimant can occasionally reach overhead, but can frequently reach in all other directions. The claimant can frequently push and pull. The claimant can frequently handle, finger, and feel. The claimant can occasionally climb ramps and stairs, climb ladders, ropes, and scaffolds, kneel, crouch, and balance. The claimant can frequently stoop and crawl. The claimant should avoid concentrated exposure to unprotected heights and dangerous moving mechanical parts.

(R. 15.) While the ALJ addressed subjective complaints, the above RFC analysis only

---

[2]    "Dyssynergic defecation is common and affects up to one half of patients with chronic constipation. This acquired behavioral problem is due to the inability to coordinate the abdominal and pelvic floor muscles to evacuate stools." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4930297/.

specifically addressed Plaintiff's complaints of physical pain, mobility, and fatigue. (R. 16-19.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff could not perform her past relevant work as a bank teller (Dictionary of Occupational Titles ("DOT") 211.362-018, light, SVP: 5). (R. 19.) The ALJ also determined that given Plaintiff's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform, including:

- Cashier 2, DOT 211.462-010, with 100,000 jobs in the national economy;

- Assembler of electrical accessories, DOT 729.687-010, with 200,000 jobs nationally; and

- Assembler of plastic hospital products, DOT 712.687-010, with 100,000 jobs nationally.

The ALJ determined that the vocational expert's testimony as to those jobs "is consistent with the information contained in the Dictionary of Occupational Titles." In addition, the ALJ noted that: "[t[he vocational expert testified that in the alternative, the claimant also acquired clerical and record keeping skills from her past work as a bank teller (SVP: 5) that transferred to jobs that could be performed with the above residual functional capacity, including:"

- Election clerk, DOT 216.362-014, sedentary, SVP: 5, with 100,000 jobs nationally;

- Throw-out clerk, DOT 241.367-030, sedentary, SVP: 4, with 200,000 jobs nationally; and

- Financial statement clerk, DOT 214.362-046, sedentary, SVP: 4, with

200,000 jobs nationally.

(R. 20.)

Accordingly, the ALJ deemed Plaintiff not disabled. (R. 21.) Plaintiff requested review of the decision and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-6.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.   RELEVANT RECORD

On November 9, 2015, Plaintiff reported to an emergency room with complaints of pain and numbness in both legs. (R. 318.) She had sensory loss, motor loss, and difficulty walking. (Id.) Plaintiff was admitted to the hospital "since she cannot weight-bear." (R. 320.) The psychiatric examination of Plaintiff showed a normal mood and affect. (R. 363.) The clinical impression was bilateral leg weakness with pain and numbness of an unknown etiology. (R. 321.) An MRI of the lumbar spine showed normal alignment with multilevel mild and mild to moderate disc bulges, but no significant thecal or neural foraminal narrowing and no evidence of direct nerve root impingement. (R. 321-22.) An MRI of the cervical spine showed mild multilevel spondylosis (R. 540), and an MRI of the thoracic spine showed mild degenerative disc disease (R. 541). Testing and imaging did not show a specific cause for Plaintiff's

symptoms, and that a conversion reaction was a possibility. (R 320, 353, 355, 396.)
Plaintiff was still complaining of lower extremity pain (pins and needles) but was overall
stable. (R. 353.)

On November 10, 2015, Plaintiff was seen by Moen Masood, M.D., for a
neurological consultation related to her leg weakness. (R. 543.) Plaintiff noted that she
had recently watched the football game with her friends, during which she experienced
right lower extremity tingling, from the knee down, and later numbness that stated to go
up to the top of her leg. (*Id.*) On the following day, she woke up with her right leg
completely numb and then began experiencing significant pain on her right side, mostly
in her hip and right side. (*Id.*) She had to leave work due to the pain. (*Id.*) When
numbness also occurred in her left side, Plaintiff presented herself to the emergency
room. (*Id.*) Her physical examination showed that she was not in any acute distress and
the range of motion of her neck and low back was full in all directions. (R. 544.) Her
fund of knowledge, speech, memory, attention, and concentration were all normal. (*Id.*)
Strength was 6/6 in bilateral upper extremities proximally and distally. (*Id.*) Bilateral
lower extremities were 3/5 proximally with a 2/5 dorsi plantar flexion. (*Id.*) Deep
tendon reflexes were slightly depressed, but symmetric throughout. (*Id.*) Sensation was
intact in the upper extremities, but, she did have a sensory level with a sense of tingling
to the T12-L1 level. (*Id.*)

A November 13, 2015 mental status examination showed that Plaintiff was not in
acute distress, her affect was pleasant and cooperative, and she did not appear dysphoric.
(R. 395.) Her speech was within normal tone, rate, and volume limits; thought process

was logical and coherent; and thought content showed no evidence of delusions. (*Id.*) She had intact recent and remote memory; good attention and concentration; good general fund of knowledge; and an average intelligence. (*Id.*) Plaintiff was diagnosed with adjustment disorder with depressed and anxious mood; rule out major depression, recurrent, mild to moderate; and rule out diagnosis for conversion disorder. (R. 396.) It did not appear that she was in severe depression or anxiety and was already on a low dosage of medication. (*Id.*)

During a November 18, 2015 psychiatric evaluation, Plaintiff reported that she had a history of anxiety and depression, and had been taking Effexor in the past, but denied any history of severe depression that had ever led to loss of functionality. (R. 374-75.) Her mental health status showed as follows: Plaintiff was in no apparent distress; she maintained good eye contact through the interview; her speech patterns were normal – no latency or pressured responses detected; her thought form was goal directed, logical; her thought content was negative for suicidal ideation, intent or plan; there was no evidence of psychosis; her mood was stressed and upset/frustrated pertaining to the "lack" of answers with what was wrong with her; she was frustrated that the dose of her Effexor medication had not been previously increased; her affect was appropriate to situation; insight and judgment were fair and clear; and her ability to focus, concentrate and attend during the interview were preserved. (R. 384.)

On November 25, 2015, Plaintiff was discharged to a short-term rehabilitation facility. (R, 352, 354.) At discharge, Plaintiff was not in any acute distress, she was alert and oriented, she demonstrated and right lower extremity weakness, and her muscle

strength was at 4+/5. (R. 354.) In addition, Plaintiff was placed on or continued on medications for her depression, including Effexor. (*Id.*)

Plaintiff was discharged from the rehabilitation center on December 3, 2015. (R. 412.) It was noted that she needed assistance with activities of daily living. (R. 412.) Because of the severe weakness in both of her legs, Plaintiff ambulated with a walker, but her gait was severely impaired, and she had very little feeling from the knees down. (*Id.*) She was discharged with a single point cane and the help of her family. (R. 437-39.)

On February 3, 2016, Plaintiff was seen for a follow-up related to her depression, which had been diagnosed several years earlier. (R. 572.) Plaintiff felt that her depression symptoms were getting worse due to stress related to her lower extremity weakness. (*Id.*) Plaintiff's affect was depressed and tearful. (*Id.*) Her depression symptoms were worsening lately which was likely due to her current health concerns. (*Id.*) It was noted that her dosage of Effexor had been increased two months earlier and the plan was to continue with the dosage and determine if a new medication was necessary at a later date. (*Id*).

On May 10, 2016, Plaintiff was seen by a neurologist related to her lower extremity weakness. (R. 459.) The physical examination showed that she had multiple mildly tender points throughout that could suggest a predisposition to fibromyalgia. (R. 460.) The neurological examination revealed some antalgic and mild unsteadiness to her gait, she had a mild difficulty with tandem gait, and there was a mild-to-moderate sway. (*Id.*) Her strength examination revealed a give-away component in the lower right extremity without any evidence of severe weakness. (*Id.*) Reflexes were absent in the

lower extremities and reduced in the upper extremities. (*Id.*) The MRIs showed no major abnormalities. (*Id.*) Plaintiff was diagnosed with an episode of lower extremity weakness and pain, resolving, uncertain etiology. (*Id.*) It was noted that Plaintiff had improved over time. (R. 461.) While Plaintiff did have some tender points suggesting a predisposition to fibromyalgia that could have been contributing to some of her symptoms, it did not explain everything, as her symptoms were more focal in the lower extremities than diffuse and more chronic than a rapid process. (*Id.*)

On May 12, 2016, Plaintiff was diagnosed with fibromyalgia based on her symptoms. (R. 470-71.)

On June 21, 2016, Plaintiff was seen for her constipation and for a pelvic floor assessment. (R. 483.) Plaintiff reported constipation and bloating and no bowel movements for up to four days, unless she took a laxative cocktail of Milk of Magnesia, Dulcolax, and MiraLAX (she also used suppositories and enemas). (*Id.*) The EMG assessment revealed dyssynergic defecation and it was found that Plaintiff would be an excellent candidate for pelvic floor rehabilitation. (R. 484.)

On August 3, 2016, Plaintiff presented for an evaluation at the Mayo Clinic Fibromyalgia and Chronic Fatigue Clinic. (R. 487.) Plaintiff reported current pain everywhere below the waist and a lot of numbness. (*Id.*) The only numbness she reported at the appointment was numbness in her toes and she was currently able to walk. (*Id.*) There were times when her legs "did not work," but she noted at those times that she could rest and then was able to "go again." (*Id.*) She also described persistent unexplained fatigue: present for 6 months or more that was not due to ongoing exertion;

not substantially relieved with rest; was of new onset; resulted in a significant reduction in previous levels of activity; and involved a persistent feeling of a debilitating level of tiredness that was not substantially relieved with rest. (R. 487, 492.) According to Plaintiff, the exhaustion/postexertional malaise interfered with her activities and resulted in impaired memory or concentration, and unrefreshing sleep. (R. 488.) Her examination was positive for tender points consistent with fibromyalgia. (R. 490.) Based on her evaluation, it was found that Plaintiff was a good candidate for a comprehensive pain rehabilitation program. (R. 491.) A physical examination on the same date showed that her mental and neurological examinations were normal. (R. 495.)

On September 1, 2016, medical providers noted that Plaintiff underwent physical therapy for her lower extremity weakness and noted that her weakness was slowly improving, but she was still having pain in her lower extremities, mainly in her thighs. (R. 580.) Sensation was decreased in both of her lower extremities. (*Id.*)

On September 30, 2016, it was noted that Plaintiff had switched from Effexor to Cymbalta to help deal with her depression and pain. (R. 583.) Plaintiff complained of weakness and pain in her legs. (R. 584.) Her examination showed that she had some tenderness to palpitation at both paraspinal area of lower lumbar spine and sacral area. (*Id.*) Her leg strength was normal, but she had decreased sensitivity in both of her lower extremities. (*Id.*) Plaintiff's Cymbalta dosage was increased, and she was continued on hydrocodone for her pain. (*Id.*) Plaintiff was assessed with major depressive disorder with a single episode, in full remission, and pain in her lower extremities. (*Id.*)

On March 28, 2017, Plaintiff was seen for a neurology follow-up with Dr.

10

Masood.  (R. 519.)  Plaintiff reported that her weakness had started getting better, but she was still using a cane, and that by March 16, she had not been using a cane as much.  (*Id.*)  Plaintiff asserted that from the waist up she felt normal.  (*Id.*)  Plaintiff also reported that she went back to work on March 16, 2017, and that she had to sit and stand at work, and that sitting for a long period of time hurt more than standing for a long period of time.  (*Id.*)  Since then, she had been in and out of work and was still applying for long-term disability benefits.  (*Id.*)  Her examination showed a normal mental status, including with respect to her concentration, memory, fund of knowledge, and executive functions.  (R. 521.)  Lower muscle strength was 4/5 with some give away, and 5/5 in the upper extremities.  (*Id.*)  Her sensation was normal to pin prick, vibration, joint position, and light touch, although she had a vague reduction in her legs.  (R. 522.)  The assessment for Plaintiff was paraparesis, numbness and tingling of both legs, and unsteadiness on her feet.  (*Id.*)

On May 9, 2017, Plaintiff was seen for a follow-up related to symptoms of myelitis.[3]  (R. 515.)  Plaintiff claimed that if she sat for an hour, she would be completely numb in her legs, could not feel her butt or legs, and would have difficulty getting up.  (*Id.*)  If she was standing or moving around, then she would have weakness and pain in her legs.  (*Id.*)  Her bladder was improved, although she stated that if she slept through the night, in the morning she would not be able to make it to the bathroom.  (*Id.*)  Her

---

[3]    The Court notes that "[t]ransverse myelitis is an inflammation of the spinal cord, the part of the central nervous system that sends impulses from the brain to nerves in the body."  https://www. ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Transverse-Myelitis-Fact-Sheet.

bowels also improved with an aloe capsule, and she reported that she had a bowel movement each day.  (*Id.*)  Household chores exhausted her.  (*Id.*)  Plaintiff denied experiencing anxiety, depression, hallucinations, or suicidal ideation.  (R. 517.)  Her examination showed a normal mental status, including with respect to her concentration, memory, fund of knowledge, and executive functions.  (*Id.*)  She also demonstrated normal muscle strength and sensation upon examination.  (*Id.*)  While she had improved to the point where she could stand and walk, her gait showed a little spasticity.  (R. 517-18.)

On March 28, 2017, it was reported that Plaintiff had returned to work for 16 hours per week, getting up to 25 hours, without a cane, but that she had resigned her position.  (R. 589-90.)  She asserted that she could walk up to a couple of miles.  (R. 590.)  Plaintiff claimed that she still occasionally experienced falls, that it took a lot of energy to get ready in the morning, and it was hard for her to focus.  (*Id.*)  It was noted that she was on long-term disability.  (*Id.*)

On April 12, 2017, Plaintiff was seen for a behavioral assessment.  (R. 605.)  Her affect was blunted, she had a depressed mood, her insight was fair, she demonstrated normal speech, and her prognosis was fair.

On April 25, 2017, Plaintiff was examined by Susan Ferron, M.D.  (R. 616.)  Dr. Ferron found that Plaintiff appeared normal with appropriate affect and judgement.  (*Id.*)  She was diagnosed with fibromyalgia, lower extremity weakness, and sensory ataxia.  (R. 616-17.)

On May 9 and 17, 2017, Plaintiff reported that her level of pain had been stable,

her mood was stable, her activity level had increased, her stress was decreased, and her overall prognosis had been stable. (R. 628, 631.)

On May 23, 2017, Plaintiff was again examined by Dr. Ferron, who found that Plaintiff appeared normal and healthy, she showed a full-featured affect, and her intellectual functioning was within normal limits. (R. 638) She was diagnosed with fibromyalgia. (*Id.*) Pacing was discussed and the need to be able to identify activities that could be done on a daily basis that did not lead to flare ups. (*Id.*) Plaintiff was also tasked with determining how far she could comfortably walk. (R. 639.)

On September 8, 2017, Plaintiff reported that she had discontinued taking Topamax for her chronic pain management because it was not working. (R. 646.) She also asserted that her depression symptoms were "well controlled" on Cymbalta. (*Id.*) Plaintiff did not appear in any distress. (*Id.*)

On September 27, 2017, Plaintiff reported to Dr. Ferron that she had a very busy summer, including hosting a graduation party for her daughter, hosting an 80th birthday party for her mother, gardening, and other activities. (R. 649.) She claimed as part of this that she could garden for 3-4 hours at a time, was able to go shopping, and did all of her own housework. (*Id.*) While Plaintiff's diagnosis continued to be fibromyalgia, Dr. Ferron opined that "from what I know at this time I would [sic] she would be able to return to work" and referred Plaintiff to an occupational medicine physician. (R. 653.)

On November 14, 2017, Plaintiff was seen for her myelitis. (R. 511.) Plaintiff reported poor balance with 5 to 6 falls since her previous visit, occurring mostly while walking or while reaching to sit in a chair without arm rests. (*Id.*) Plaintiff denied any

anxiety or depression and her mental status examination was normal. (R. 513.) She had normal muscle strength and was able to stand without difficulty, but her gait was spastic, and she showed poor balance. (R. 513-14.)

On March, 9, 2018, the agency consulting medical doctor opined that Plaintiff had severe impairments consisting of degenerative back disorder, fibromyalgia, and a sleep breathing disorder. (R. 68.) According to the consulting medical doctor, Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day; had an unlimited ability to push and pull; could frequently climb stairs, occasionally climb ladders, occasionally balance, frequently stoop, frequently kneel, frequently crouch, and frequently crawl. (R. 72.) It was also noted that Plaintiff had no manipulative, communicative, or environmental limitations, except with respect to avoiding concentrated exposure to hazards such as machinery and heights. (R. 73.) The findings on reconsideration in June 2018 were essentially the same, except Plaintiff was found only able to occasionally climb stairs. (R. 87-89.)

On March 26, 2018, Plaintiff reported some right lower quadrant pain that had been occurring sporadically for two months, with it more recently being intense. (R. 731.) Plaintiff reported still having issues with her bowels because of her sensory ataxia, fluctuating between constipation and diarrhea. (*Id.*) Plaintiff's examination showed that her bowel sounds were normal, and she exhibited no distension and no mass. (R. 732.) While there was tenderness, Plaintiff was not observed rebounding or guarding during the examination. (*Id.*) Imaging showed a non-obstructing kidney stone. (R. 733.)

14

On April 28, 2018, Plaintiff underwent a psychological consultation regarding her claimed depression and anxiety with respect to her application for social security benefits. (R. 686.) As part of the review of records, psychologist Dr. Monique Bordeaux noted that Plaintiff had a history of major depressive disorder in partial remission. (R. 687.) Plaintiff's current level of daily functioning included doing chores, such as laundry and cleaning up her kitchen, walking down her driveway with the dog to get the mail, watching television, running errands, going shopping, making meals, doing yoga, and spending time with her husband. (*Id.*) Plaintiff was able to adequately dress and groom herself. (*Id.*) She could also drive and had a checking account. (*Id.*) Dr. Bordeaux noted that Plaintiff appeared to be in good health, she was relaxed and alert, she did not appear to be preoccupied or easily distracted, her speech was normal, she was attentive during the interview, her affect was normal, and she did not appear to be depressed, anxious or irritable. (R. 688.) While Plaintiff espoused normal ups and downs to being frustrated about her physical health, she claimed she was doing "okay" with respect to her mental health and generally denied any mental health concerns. (*Id.*) There was also no evidence of thought disorders. (*Id.*) Dr. Bordeaux assessed Plaintiff with no DSM-5 diagnoses and found her mental health prognosis to be moderate. (R. 689.) Dr. Bordeaux also opined as follows:

> Based on this psychologist's findings, she is able to understand and follow directions. She is able to sustain attention and concentration. She is mentally able to carry out work-like tasks with reasonable persistence and pace. She is able to relate appropriately with at least brief and superficial contact with coworkers and supervisors. She was friendly, appropriate with this examiner and tolerated the interview well. She is able to tolerate the mental stressors of at least an entry level workplace. She denied mental health concerns. Her

main concerns were physical stressors.

(R. 689.)

On April 30, 2018, an agency consulting psychologist opined that the available records showed that Plaintiff had depressive, bipolar, and related disorders, an anxiety and obsessive-compulsive disorder, and somatic system disorders, none of which were severe nor met criteria "A" of the Listings.  (R. 69.)  The consulting psychologist found that "[b]ased on the evidence in the MER, the claimant's mental impairment is not imposing any significant work related limitations and are considered not severe."  (R. 70.)  The consulting psychologist also went on to examine the "B" criteria of the Listings and found that Plaintiff only had mild limitations with respect to: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting oneself.  (R. 69.)

On June 29, 2018, an agency consulting psychologist found on reconsideration the same severity of limitations (except for an additional non-severe trauma disorder).  (R. 84-85.)

On June 20, 2018, Plaintiff saw Dr. Masood for a follow-up for symptoms of myelitis and to have her disability paperwork filled out.  (R. 672.)  Plaintiff complained of pain mostly in the right groin to the bottom of her knee bilaterally, her knee felt numb, and her feet were painful to stand on after about 45 minutes.  (*Id.*)  She did assert that she was not having as much of a problem with her bowel or bladder.  (*Id.*)  Plaintiff's mental examination, including her concentration, memory and fund of knowledge, were normal.  (R. 674.)  Muscle strength and sensation were also normal.  (R. 675.)  With respect to her

16

gait, it was noted that she walked favoring her right leg as if it was spastic, but there was

no spasticity on examination. (*Id.*)  In addition, Plaintiff was able to stand without

difficulty. (*Id.*)  Dr. Masood also opined as follows:

> Apart from difficulty with tandem walk and mild spasticity and favoring her right leg while walking with no spasticity on examination expecting that she may be able to work at least given a trial for work and attentive work she did before as a banker.  As the notes from the Mayo Clinic mentioned that she may have sensory ataxia of uncertain etiology possibly due to prior chemotherapy use but I cannot really find any signs of any ongoing pathology at this time.  I did discuss this with her in detail.  She does have mild weakness of bilateral abductor pollicis brevis suggesting a mild carpal tunnel syndrome that I would not recommend any intervention for that at this time because of some mild [sic].  I would continue her on the current medications without any change.  I told her that there is not much for me to offer her as far as the neurological intervention is concerned she can follow up with me on a when necessary basis.  As for her pain in her lower extremities she can continue to follow with the pain clinic.

(R. 675.)

In the follow-up medical source statement signed on June 25, 2018, Dr. Masood

found that Plaintiff had a good prognosis. (R. 679, 684.)  With respect to Plaintiff's pain

and medication, Dr. Masood found that they seldom were severe enough to interfere with

her attention and concentration. (R. 680.)  Dr. Masood also opined that Plaintiff could

tolerate low stress jobs, did not need an assistive device to walk, and was able to

effectively ambulate in order to get to work. (*Id.*)  According to Dr. Masood, Plaintiff

was able to perform light work involving lifting/carrying 20 pounds occasionally, 10

pounds frequently, standing/walking for more than 2 hours of 8-hour day, and could work

6-8 hours per day four to 5 days a week. (R. 681.)  Plaintiff did not need to lie down to

relieve her symptoms. (R. 682.)  Dr. Masood believed that Plaintiff would need to miss

work 1-2 times per month related to her physical impairments. (*Id.*) Dr. Masood further opined that Plaintiff could frequently reach and occasionally perform overhead work. (R. 683.) Dr. Masood believed that Plaintiff could engage in repetitive activities involving her upper extremities. (R. 684.) She had good use of both hands and finger for bilateral manual dexterity, had good use of her hands and fingers for repetitive hand-finger actions, and could manipulate and work with small objects with both hands. (*Id.*) Finally, Dr. Masood opined that Plaintiff could sit for at least 6 hours in an 8-hour workday and could stand 2-4 hours in an 8-hour workday. (*Id.*)

On August 22, 2018, Plaintiff was seen for pain in both hands with a duration of six months, which had worsened. (R. 734.) Plaintiff's examination showed that she was in no apparent acute distress. (R. 735.) She demonstrated normal grip strength, no swelling, and tenderness in the right thumb. (R. 736.)

On August 22, 2018, Plaintiff was seen for an exam of her hands with complaints of numbness in her hands and pain in her fingers. (R. 717.) Plaintiff had been wearing a brace on her right wrist to try and help manage her pain, and had noticed her symptoms elevate to the point that she had pain in her hands even at rest. (*Id.*) She also reported that she had started to feel clicking and locking in her left index and middle fingers in the previous 2-3 months, causing her pain at her thumbs when trying to grip or grasp. (*Id.*) She reported having a job in a bank involving typing tasks that she has been doing for 20 years. (*Id.*) Plaintiff denied any other concerns or complaints. (*Id.*) The exam of Plaintiff showed a positive Tinel's at the wrists and a positive Phalen's bilaterally; her hands had decreased subjective sensation at the median nerve distribution but were

neurovascularly intact; her wrists had full range of motion and were mildly swollen; her fingers had a decreased sympathetic tone bilaterally; there was mild swelling at the base of the thumbs and tenderness to palpation at the bilateral basal joints; her thumbs showed limited range of motion secondary to pain and were being held in an adducted position; her fingers had no overt triggering, full range of motion, mild swelling, and were neurovascularly intact with full profusion throughout; and there were obvious degenerative changes at the right index finger joint. (R. 719.) Plaintiff was diagnosed with bilateral carpal tunnel syndrome; bilateral basal joint arthritis; and left index and middle trigger fingers. (*Id.*) Plaintiff was provided with a brace and splint. (R. 720.)

On September 11, 2018, Plaintiff underwent a right carpel tunnel release and basal joint injection. (R. 716, 724-27.)

On March 5, 2019, Plaintiff had complaints of constipation, claiming that she had not gone to the bathroom for 5 days, and it was noted that x-ray showed a moderate amount of stool in her colon. (R. 741.) Plaintiff was told to use a Dulcolax suppository to help with constipation. (*Id.*) A March 27, 2019, CT image was unremarkable as it related to Plaintiff's gastrointestinal system. (R. 742.)

On March 25, 2019, Plaintiff was seen for complaints relating to low back pain with radiation into the right leg. (R. 709.) The exam of Plaintiff showed that she displayed an appropriate mood and affect. (R. 712.) Her gait was antalgic when weight bearing on the right, but her toe walking and heel walking were normal. (*Id.*) Palpitation of Plaintiff's back was positive for tenderness, her bilateral lower extremity strength was normal, there were no atrophy or tone abnormalities noted, she displayed a normal range

of motion of her lumbar spine with no pain (except for low back pain with lumbar flexion), and straight leg raising in the sitting position was negative to radicular pain bilaterally. (*Id.*) No loss of sensation to light touch was noted in her lower extremities. (*Id.*) Plaintiff was diagnosed with chronic low back pain with radiation into the leg. (*Id.*) Plaintiff opted to obtain an updated MRI of her lumbar spine. (R. 713.)

On April 10, 2019, Plaintiff was seen by David Gerlach, M.D. for bilateral thumb pain. (R. 703.) It was noted that Plaintiff had previously been diagnosed with left carpal tunnel syndrome, that she was over 7 months out from her right carpal tunnel release, and had seen relief of the numbness and tingling in her hand since surgery. (*Id.*) The diagnosis was bilateral thumb basal joint osteoarthritis and left carpal tunnel syndrome. (R. 705.)

On April 15, 2019, Plaintiff saw James Parmele, M.D. for her bilateral back pain and lower extremity pain. (R. 699.) Plaintiff noted no falls within the last year. (R. 700.) The examination of Plaintiff showed that she was not in acute distress; she had a normal gait and sat comfortably; she demonstrated normal coordination in her upper extremities, normal coordination in her lower extremities, normal reflexes, and a reduced sensation in her buttock, hips and lower back; and she demonstrated a normal mood and affect. (*Id.*) Plaintiff was to continue on Cymbalta and gabapentin. (R. 701.) Plaintiff's lumbar MRI was positive for multilevel nonacute spondylosis. (*Id.*; *see also* R. 728-29.)

On April 5, 2019, Plaintiff was seen for complaints relating to low back pain with radiation into the right leg. (R. 706.) Intermittent numbness and weakness were noted in her legs. (*Id.*) The diagnosis for Plaintiff was chronic low back pain with radiation into

20

the right leg and a small left L4-5 disc bulge with no significant neurological compression at any level. (R. 708.) Recommended treatment included participation in a chronic pain program. (*Id.*)

On April 23, 2019, Plaintiff saw Dr. Parmele, again related to her chronic right hip and bilateral lower extremity pain. (R. 696.) She rated her pain as 6/10, with most of her pain being in her right hip and groin. (*Id.*) She also reported pain and numbness in her bilateral lower extremity that spanned from her mid anterior thigh down to mid anterior calf, as well as swelling and numbness from her ankles through her toes. (*Id.*) Plaintiff was taking Celebrex and gabapentin for her pain with moderate relief. (*Id.*) Plaintiff reported that she was not feeling depressed. (R. 696.) The examination of Plaintiff showed that she was not in acute distress, she had a normal gait and sat comfortably, she demonstrated normal coordination in her upper extremities and normal coordination in her lower extremities, she was alert and orientated, and she demonstrated a normal mood and affect. (*Id.*) Plaintiff was assessed with chronic polyneuropathy, unspecified, spondylolisthesis, lumbosacral region, and spondylosis without myelopathy or radiculopathy, lumbosacral region. (*Id.*) Plaintiff was told to continue with her Celebrex and gabapentin and to undergo a lumbar medial branch block. (R. 697.)

On April 30, 2019, Plaintiff underwent a bilateral lumbar medial branch block at the L3-41 L4-5, L5-S1 related to the lumbar spondylosis. (R. 694.)

On May 9, 2019, Plaintiff was seen for her lower back and hip pain with numbness. (R. 750.) Plaintiff reported that Gabapentin provided her adequate pain relief with no side effects. (R. 750.) Her depression screening was negative for depression and

she reported no anxiety. (R. 750-51.) She also reported no falls over the past year. (R. 750.) Plaintiff's examination showed that was not in acute distress; she had a normal gait, although she ambulated with a cane; and was able to sit comfortably. (*Id.*) She also showed normal coordination as to her upper and lower extremities and a normal mood and affect. (R. 751.) As a result of her continuing pain in her back and hip, a lumbar injection and aquatic therapy was ordered, as well as having her continue to take gabapentin and Cymbalta for her pain. (*Id.*)

On May 15, 2019, Plaintiff underwent an epidural steroid injection at the bilateral L5-S1 levels. (R. 748.) Plaintiff rated pain before the injection as a 4-5 out of 10, and after the shot it was 0 out of 10. (*Id.*)

On June 12, 2019, Plaintiff was again seen for lower back pain and leg pain. (R. 766.) Plaintiff reported that the recent injection provided her with 20% pain relief, and she reported moderate pain relief from her medication with no side effects. (R. 766.) Plaintiff's depression screening was positive for moderate depression. (*Id.*) Plaintiff denied any anxiety. (R. 776.) Plaintiff's examination showed that she was not in acute distress, she had a normal gait, and was able to sit comfortably. (*Id.*) She also showed normal coordination as to her upper and lower extremities and a normal mood and affect. (*Id*.) The assessment for Plaintiff was spondylosis, chronic pain and radiculopathy, lumbosacral region. (R. 767-77.) Plaintiff was to continue on her pain medications, with an increase in her gabapentin. (R. 767.)

### III.    <u>LEGAL STANDARD</u>

Judicial review of an ALJ's denial of benefits is limited to determining whether

substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's

decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086,

1089 (8th Cir. 2018).  As recently defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency factfinding.
> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence to
> support the agency's factual determinations.  And whatever the meaning of
> "substantial" in other contexts, the threshold for such evidentiary sufficiency
> is not high.  Substantial evidence . . . is more than a mere scintilla.  It means—
> and means only—such relevant evidence as a reasonable mind might accept
> as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision

as well as evidence that supports it."  *Nash*, 907 F.3d at 1089 (marks and citation

omitted).  "If substantial evidence supports the Commissioner's conclusions, this court

does not reverse even if it would reach a different conclusion, or merely because

substantial evidence also supports the contrary outcome."  *Id.*  "In other words, if it is

possible to reach two inconsistent positions from the evidence, and one of those positions

is that of the [ALJ], the Court must affirm the decision."  *Jacob R. v. Saul*, No. 19-CV-

2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v.

Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

"In order to receive disability insurance benefits, an applicant must establish that

she was disabled before the expiration of her insured status." *Pyland v. Apfel*, 149 F.3d 873, 876-77 (8th Cir. 1998); s*ee also* 42 U.S.C. § 416(i)(3); 20 C.F.R. § 404.130; *Rasmussen v. Shalala,* 16 F.3d 1228 (8th Cir. 1994). A non-disabling condition, which later develops into a disabling condition after the expiration of a claimant's insured status, cannot be the basis for an award of disability benefits under Title II. *See Thomas v. Sullivan*, 928 F.2d 255, 260-61 (8th Cir. 1991). It is not enough that the impairments existed before the date a claimant's insured status expired; the impairments must have been disabling at that time. *See* 20 C.F.R. § 404.131(a). Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, only to the extent that it helps to elucidate a medical condition during the time for which benefits might be rewarded. *See Pyland*, 149 F.3d at 877 (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)).

## IV.    DISCUSSION

Plaintiff requests remand and sets forth three arguments in support of her request. She asserts remand is required because (1) the ALJ failed to identify, address, and explain the resolution of the apparent conflict between the VE's testimony and the DOT with respect to the act of reaching; (2) the ALJ failed to include mental limitations she found credible in her RFC (and hypothetical question to the vocational expert); and (3) the ALJ made significant legal errors in evaluating the severity of Plaintiff's admittedly medically determinable impairments involving functional neurological symptom disorder (also referred to by Plaintiff as "conversion disorder"), bilateral carpal tunnel syndrome, fibromyalgia, and the incontinence caused by her dyssynergic defecation. (Dkt. 16 at 7-

24

17.)

The Court addresses each argument in turn.

## A.      Conflict with the DOT

Plaintiff argues that there was an apparent conflict in that the hypothetical question to the VE precluded more than occasional overhead reaching, yet the DOT indicates that every single occupation identified by the VE and adopted by the ALJ requires frequent reaching under DOT §§ 211.462-010, 214.362-046, 216.362-014, 241.367-030, 712.687-010, 729.687-010.  (Dkt. 16 at 7.)  Based on this conflict, it is Plaintiff's assertion that the ALJ failed to follow the requirements under Social Security Ruling ("SSR") 00-4p to identify, address, and explain the resolution of the apparent conflict as to reaching.  (*Id.* at 7-9.)  Defendant concedes the apparent conflict between Plaintiff's limitation to only occasional overhead reaching (and frequent reaching in all other directions) and the DOT's job descriptions indicating that the six occupations addressed above require frequent reaching—without distinguishing between overhead reaching and reaching in other directions.  (Dkt. 18 at 10.)  However, Defendant counters that Plaintiff overlooks that the ALJ and VE specifically addressed this issue and resolved the potential conflict at the end of the VE's testimony, when the ALJ explicitly asked the VE if his testimony was consistent with the DOT, and the VE responded by confirming that the DOT did not specifically address overhead reaching and differentiate it from reaching in other directions, but resolved the potential conflict by testifying that his testimony confirming that these occupations did not require more than occasional overhead reaching was based on his experience of having done job analysis and labor market surveys.  (Dkt. 18 at 11.)

Defendant also argued in the alternative that any failure to address the conflict is harmless since the VE also testified that a hypothetical person with Plaintiff's RFC, except with more restrictive manipulative restrictions, could perform other light unskilled positions not requiring more than occasional reaching. (*Id.* at 11-12.) The Commissioner acknowledges that the ALJ did not rely or cite to these positions in her decision. (*Id.* at 12.) In her Reply, Plaintiff argues that it was the ALJ, not the VE, that needed to resolve the conflict under SSR 00-04p, and that the Commissioner cannot rely on an alternative basis not considered by the ALJ, especially since the VE never opined that these positions could be performed with only occasional reaching. (Dkt. 19 at 1-2.)

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that significant numbers of jobs exist that a person with the claimant's RFC can perform, and an ALJ "may rely on a vocational expert's response to a properly formulated hypothetical question." *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004) (citation omitted). However, VE testimony that conflicts with the DOT does not constitute substantial evidence upon which the commissioner may rely to meet the burden of proving the existence of other jobs that a claimant can perform. *See Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014). The Eighth Circuit has described the ALJ's duty to resolve conflicts between the DOT description of a position and the VE's testimony as follows:

> The Dictionary of Occupational Titles provides "standardized occupational information" by listing the functional requirements for a number of jobs available in the national economy. *Dictionary of Occupational Titles*, at xv (4th rev. ed. 1991). The reference book explains, however, that the job characteristics for each position "reflect[ ] jobs as they have been found to

occur, but . . . may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *Id.* at xiii. Thus, "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the [Dictionary]." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000). The reference book "gives the approximate maximum requirements for each position." *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995). As a result, an ALJ in some instances may rely on testimony from a vocational expert that conflicts with the job requirements listed in the Dictionary—for example, if the expert limits his testimony to jobs within a particular Dictionary description that require less than the listed maximum functional requirements. *See Thomas v. Berryhill*, 881 F.3d 672, 677-78 (8th Cir. 2018).

This court, however, long has held that before an ALJ can rely on a vocational expert's testimony that appears to conflict with a Dictionary listing, the ALJ must identify and resolve the conflict. Otherwise, the vocational expert's testimony is not substantial evidence to support a denial of benefits. *See Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997); *Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995). In 2000, the Commissioner adopted this rule as its own in Social Security Ruling 00-4p, and we have continued to apply it. Whether the vocational expert's testimony is substantial evidence in support of the ALJ's decision thus depends on whether the expert's testimony appears to conflict with the Dictionary, and if so, whether the ALJ resolved the conflict.

*Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 558 (8th Cir. 2018).

Here, the ALJ inquired of the VE as to any inconsistencies between his testimony and the DOT:

ALJ: Dr. Mosley, has your testimony been consistent with the DOT and SCO?

VE: Other than what I've indicated, only one other area, of overhead, occasional overhead reaching. The dictionary does not specifically address overhead reaching. My opinion is based on my experience having done job analysis and labor market surveys.

(R. 57.) SSR 00-4p provides that "Reasonable explanations for such conflicts, which may provide a basis for relying on the evidence from the VE or VS, rather than the DOT

information, include, . . . reliable publications, information obtained directly from

employers, or from a VE's or VS's experience in job placement or career counseling."

2000 WL 1898704, at *2; *see also, Higgins v. Comm'r of Soc. Sec*., 898 F.3d 793, 796

(8th Cir. 2018) ("As always, an ALJ may rely on VE testimony about common

workplace practices based upon the expert's knowledge and experience.") (citation

omitted).

That said, the ALJ's decision in this case inexplicably does not resolve any

inconsistencies with respect to reaching under the DOT and the VE's testimony, let

alone even identify the inconsistency.  Rather, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range
> of light work, a finding of "not disabled" would be directed by Medical-
> Vocational Rule 202.14.  However, the claimant's ability to perform all or
> substantially all of the requirements of this level of work has been impeded
> by additional limitations.  To determine the extent to which these limitations
> erode the unskilled light occupational base, the Administrative Law Judge
> asked the vocational expert whether jobs exist in the national economy for
> an individual with the claimant's age, education, work experience, and
> residual functional capacity.  The vocational expert testified that given all of
> these factors the individual would be able to perform the requirements of
> representative occupations such as the following light, unskilled (SVP: 2)
> jobs:
>
> - Cashier 2, DOT 211.462-010, with 100,000 jobs in the national economy;
> - Assembler of electrical accessories, DOT 729.687-010, with 200,000 jobs
> nationally; and
> - Assembler of plastic hospital products, DOT 712.687-010, with 100,000
> jobs nationally.
>
> Pursuant to SSR 00-4p, **the undersigned has determined that the
> vocational expert's testimony is consistent with the information
> contained in the Dictionary of Occupational Titles**.  The vocational expert
> testified that in the alternative, the claimant also acquired clerical and record
> keeping skills from her past work as a bank teller (SVP: 5) that transferred
> to jobs that could be performed with the above residual functional capacity,

including:

- Election clerk, DOT 216.362-014, sedentary, SVP: 5, with 100,000 jobs nationally;
- Throw-out clerk, DOT 241.367-030, sedentary, SVP: 4, with 200,000 jobs nationally; and
- Financial statement clerk, DOT 214.362-046, sedentary, SVP: 4, with 200,000 jobs nationally.

Dr. Mosley testified that these jobs would not require learning additional skills, and were in the same work field dealing with the same products and services as her past relevant work. Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(R. 20.)

SSR 00-04p is clear in this regard: "When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. **The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified**." 2000 WL 1898704, at *4 (emphasis added); *see also Johnson v. Shalala*, 60 F.3d 1428, 1434 n. 7 (8th Cir. 1995) (the ALJ can rely on the VE's testimony, which departs from the DOT, where the ALJ makes findings of fact which support the departure). Such a finding with respect to resolving the inconsistencies regarding overhead reaching as it relates to the DOT and the VE's testimony is absent from the ALJ's decision.

The Court also rejects the Commissioner's argument that the ALJ's error is harmless since there were additional positions covered by the VE that addressed the reaching issue. The Court acknowledges that VE testified that a person with additional limitations of being able to only occasionally handle, finger, and feel (which were not ultimately adopted by the ALJ) could perform jobs at a light level with respect to three additional light unskilled occupations of: Greeter (listed in the DOT as "Host/Hostess, Head") – DOT number 349.667-010, 1991 WL 672884 (over 100,000 jobs nationally); Usher – DOT number 344.677-014, 1991 WL 672865 (over 100,000 jobs nationally); and Children's Attendant – DOT number 349.677-018, 1991 WL 672889 (over 100,000 jobs nationally). (R. 52.) The DOT for these positions at most only requires occasionally reaching. However, judicial review of an agency decision is limited to the grounds identified in the agency's decision. *See Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) ("'A reviewing court may not uphold an agency decision based on reasons not articulated by the agency,' when 'the agency has failed to make a necessary determination of fact or policy' upon which the court's alternative basis is premised.") (cleaned up) (quoting *Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir.1998)). Indeed "'a reviewing court cannot search the record to find other grounds to support the decision of the ALJ.'" *Shanda v. Colvin*, No. 14-cv-1838 (MJD/JSM), 2015 WL 4077511, at *29 (D. Minn. July 6, 2015) (quoting *Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir. 1990)). "'A court must consider the agency's rationale for its decision, and if that rationale is inadequate or improper the court must

reverse and remand for the agency to consider whether to pursue a new rationale for its decision or perhaps to change its decision.'" *Id.* (quoting same). Moreover, an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and cannot be sustained on the basis of post-hoc rationalizations of appellate counsel. *See Stacey S. v. Saul*, No. 18-CV-3358 (ADM/TNL), 2020 WL 2441430, at \*15 (D. Minn. Jan. 30, 2020), *R.&R. adopted*, 2020 WL 1271163 (D. Minn. Mar. 17, 2020) (citation omitted). Here, there may have been a reason, to which the Court is not privy, why the ALJ decided not to rely on the hostess, usher and attendant positions to find that Plaintiff was capable of work that exists in significant numbers in the national economy.

On remand, the ALJ may choose to clarify the conflict with respect to reaching overhead or find that the positions of hostess, usher, and attendant positions are sufficient to demonstrate that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

## B.    The ALJ's Decision Regarding Plaintiff's Mental Impairments

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v.*

*Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Perks*, 687 F.3d at 1092 (marks and citations omitted).

At step two, the ALJ found that Plaintiff's medically determinable mental impairments of depressive disorder, adjustment disorder, and anxiety disorder did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and were therefore nonsevere.  (R. 13.)  The ALJ found at steps two and three that Plaintiff had mild limitations in understanding, remembering, applying information; concentrating, persisting and maintaining pace; interacting with others; and adapting and managing herself.  (R. 13-14.)  As set forth previously, the RFC did not include any mental limitations.  (*See* R. 15.)  Nor did the ALJ address any limitations with respect to Plaintiff's depressive disorder, adjustment disorder, and anxiety disorder in the RFC analysis.  (R. 15-19.)

Plaintiff argues that the RFC is not supported by substantial evidence to the extent it excludes any mental limitations because the ALJ found at steps two and three that Plaintiff had mild limitations in understanding, remembering, applying information; concentrating, persisting and maintaining pace; interacting with others; and adapting and

managing herself.  (Dkt. 16 at 10-11.)  Plaintiff asserts that her limitations in

understanding, remembering, and applying information and concentrating, persisting, and

maintaining pace, and interacting with others are contrary to the reasoning level required

in the occupations adopted by the ALJ at step five.  (*Id.* at 11-14.)  Defendant argues that

the ALJ's finding at step two that Plaintiff's nonsevere mental impairments caused only

mild limitations in the "paragraph B" criteria meant only that she was "slightly limited"

in her general mental functioning—not that she necessarily had any corresponding

specific limitation in her mental ability to perform basic work activities.  (Dkt. 18 at 14-

18.)

    Plaintiff's argument is based on a misunderstanding of the sequential evaluation

process.  In evaluating the severity of Plaintiff's mental impairments at steps two and

three, the ALJ used the "special technique" set out in 20 C.F.R. § 404.1520a[4].  *See*

*Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th Cir. 2013).  SSR 96-8p specifically

admonishes ALJs that they "must remember that the limitations identified in the

'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate

---

[4]    As part of the special technique, the ALJ first "evaluate[s] [the claimant's]
pertinent symptoms, signs, and laboratory findings to determine whether [the claimant
has] a medically determinable mental impairment(s)."  20 C.F.R. § 404.1520a(b)(1).  The
ALJ "must then rate the degree of functional limitation resulting from the impairment(s)"
in four broad functional areas: (1) understand, remember, and apply information; (2)
interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage
oneself.  *See id.* § 404.1520a(c)(3).  The criteria are rated using a five-point scale of none,
mild, moderate, marked, and extreme.  *See id.* § 404.1520a(c)(4).  Pursuant to the
Commissioner's regulations, "[i]f we rate the degrees of your limitation as 'none' or
'mild,' we will generally conclude that your impairment(s) is not severe, unless the
evidence otherwise indicates that there is more than a minimal limitation in your ability
to do basic work activities[.]"  20 C.F.R. § 404.1520a(d)(1).

the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation

process." SSR 96-8p, 1996 WL 374184, at *4 (S.S.A, July 2, 1996). This is because the

ALJ's RFC determination "requires a more detailed assessment" than the special

technique provides. *Id.* The Eighth Circuit has also rejected Plaintiff's argument:

> Lacroix also contends that the ALJ's opinion is internally inconsistent
> because in finding "severe" impairments at step two of the five-step analysis,
> the ALJ stated that Lacroix's mental impairments "significantly limit" her
> "abilities to understand, remember and carry out simple instructions, to
> respond appropriately to supervisors, coworkers, and unusual work
> situations, and to deal with changes in routine work settings," Admin. R. at
> 16, while these limitations were not included in the ALJ's RFC analysis at
> step four. We reject this contention. Each step in the disability determination
> entails a separate analysis and legal standard.

*Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006) (citing 20 C.F.R.

§ 404.1520(a)(4)).

Plaintiff also argues that her non-severe conditions must still be accounted for in

the RFC analysis. (*Id.* at 11; Dkt. 19 at 4.) When a claimant has severe impairments but

does not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1,

the ALJ considers the limiting effects of all of the claimant's impairments, even those

that are not severe, in determining the RFC. *Id.* §§ 416.945(e) and 404.1545(e). In doing

so, the ALJ must consider all of the medical and nonmedical evidence of record. *Id.* In

this case, there is no evidence in the ALJ's decision that she considered any mental

limitation in conjunction with Plaintiff's depressive disorder, adjustment disorder, or

anxiety disorder as part of the RFC analysis, which violates the Commissioner's

regulations. *See Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir.1990) (per curium)

(finding that the SSA's "failure to follow its own binding regulations is a reversible abuse

of discretion.") (citations omitted).  Under these circumstances, the Court concludes that

that as part of the remand, the ALJ should address this error with respect to the RFC

analysis, and to recall a vocational expert for testimony to the extent necessary to address

a new hypothetical based on a modified RFC.

**C.    Functional Neurological Symptom Disorder**

Plaintiff argues that while the ALJ found that Plaintiff's functional neurological

symptom disorder was a severe impairment, the ALJ erred by only considering the lack

of objective medical findings and discounting her subjective complaints as it relates to

this impairment.  (Dkt. 16 at 16; Dkt. 19 at 5-6.)  When analyzing subjective complaints,

an ALJ must consider the entire record, including factors such as the claimant's daily

activities; the duration, frequency, and intensity of pain; precipitating and aggravating

factors; dosage, effectiveness, and side effects of medication; and functional restrictions.

*See* 20 C.F.R. § 404.1529(c)(3); *see also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir. 1984).  The ALJ need not explicitly address each *Polaski* factor, so long as she

"acknowledges and considers those factors before discounting a claimant's subjective

complaints."  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004); *see also Myrna*

*E. D. v. Saul*, No. CV 20-887 (BRT), 2021 WL 4060658, at *7 (D. Minn. Sept. 7, 2021).

The ALJ also need not credit a claimant's subjective complaints of pain if they are

inconsistent with objective medical evidence.  20 C.F.R. § 404.1529(c)(3).

Here, the ALJ represented that she considered all of the factors in the formulation

the RFC: "the undersigned has considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence

and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." (R. 15.) Indeed, the ALJ did not consider only the objective medical record, as evidenced by the fact that she relied on Plaintiff's "wide range of activities of daily living, including performing self-care, household chores, shopping, socializing, gardening, hosting family events. . . ." (R. 18.) Based on this, and the fact that Plaintiff has not pointed the Court to evidence supporting her subjective complaints with respect to functional neurological symptom disorder, the Court denies Plaintiff's motion as to this issue.

**D.    Bilateral Carpal Tunnel Syndrome**

Plaintiff also argues that the ALJ erred in finding that her bilateral carpal tunnel syndrome was a severe impairment, but adopting no limitations related to this impairment. (Dkt. 16 at 16.) That said, Plaintiff concedes that the ALJ determined that she could handle, finger, and feel frequently, but claimed it was the same as having no limitations. (*Id.*) Defendant counters that the ALJ did in fact, as ultimately conceded by Plaintiff, account for Plaintiff's mild carpal tunnel syndrome by restricting her to work not requiring her to use her hands for handling, fingering, or feeling more than two-thirds of the workday—which would naturally preclude work requiring constant and repetitive use of her hands. (Dkt. 18 at 20-21.) On reply, Plaintiff argues (without citing to any evidence) that the limitation imposed by the ALJ was insufficient to accommodate the severe impairment. (Dkt. 19 at 6.) Plaintiff maintains the burden with respect to her RFC, *see Eichelberger*, 390 F.3d at 591, and this Court has no duty to search the over 700-page record for evidence supporting Plaintiff's argument, *see Breidenich v. Saul*, No. CV 19-11074, 2020 WL 5521409, at *3 (E.D. Mich. Aug. 24, 2020), *R.&R. adopted sub*

*nom.*, 2020 WL 5514195 (E.D. Mich. Sept. 14, 2020*); see also ASARCO, LLC v. Union Pac. R. R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record." (internal quotation marks omitted)).  The Court denies Plaintiff's Motion as to carpel tunnel syndrome on this basis alone.

In any event, the Court finds that the ALJ's limitation for Plaintiff is supported by substantial evidence.  The ALJ concluded as part of Plaintiff's RFC that she could frequently handle, finger, and feel.  (R. 15.)  "Occasionally" means occurring from very little up to one-third of the time, whereas "Frequent" means occurring from one-third to two-thirds of the time.  *See Deanna T. v. Kijakazi*, No. 20-CV-576 (ECW), 2021 WL 3620172, at *19 (D. Minn. Aug. 16, 2021) (citing SSR 83-10 (S.S.A. 1983), Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2)).  While there is no dispute that Plaintiff suffered from carpel tunnel and underwent a right carpel tunnel release and basal joint injection in September 2018, by April 2019, Plaintiff herself reported that she had seen relief of the numbness and tingling in her hand since surgery (R. 703).  *See Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (impairments controlled by treatment or medication are not disabling).

For all of the reasons stated above, the Court finds no basis for remand with respect to Plaintiff's bilateral carpal tunnel syndrome.

## E.    Fibromyalgia

Plaintiff asserts that the ALJ erred when she made absolutely no finding whatsoever as to whether Plaintiff's fibromyalgia[5] was a severe impairment even though

---

[5]    Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin and fatigue,

the ALJ acknowledged that she was diagnosed with fibromyalgia in August 2016, and the agency medical consultants concluded that her fibromyalgia was a severe impairment. (Dkt. 16 at 17.)  Defendant speculates that although the ALJ did not specifically identify "fibromyalgia" as one of Plaintiff's severe impairments, it appears she more generally referenced this impairment as Plaintiff's "pain disorder" and included it as a severe impairment.  (Dkt. 18 at 21.)  In any event, Defendant argues that the ALJ's express discussion of Plaintiff's fibromyalgia and the evidence addressing it in her assessment of Plaintiff's RFC confirms that her RFC determination accounted for any such limitations from fibromyalgia that the evidence established.  (R. 15-17.)  The RFC's only references to fibromyalgia were that the neurological consultation on May 10, 2016, revealed multiple mildly tender points throughout that could suggest a predisposition to fibromyalgia and that Plaintiff was diagnosed with fibromyalgia in August of 2016.  (R. 15-17.)

In *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), the plaintiff contended that she was disabled, in part, due to borderline intellectual functioning.  *Id.* at 886. On appeal, the plaintiff "assert[ed] that the ALJ erred in failing to include her diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis."  *Id.* at 887.  Although the Commissioner in *Nicola* conceded that the plaintiff's borderline intellectual functioning should have been considered a severe impairment, the

---

but with an uncertain cause.  *See* Stedman's Medical Dictionary, Fibromyalgia (28th Ed. 2006).  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally, there must be point tenderness in at least 11 of 18 specified sites.  *Id.*

Commissioner argued that the ALJ's error was harmless.  *Id.*  The Court of Appeals for the Eighth Circuit "reject[ed] the Commissioner's argument of harmless error," noting that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence."  *Id.*

Courts have been split regarding whether an error at step two can be harmless. "Some Courts have interpreted Nicola to mean that an error at step two can never be harmless."  *Lund v. Colvin*, No. 13-cv-113 JSM, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (collecting cases); *see also Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe.").  Other courts, including other courts in this District, have refused to interpret Nicola as establishing a per se rule that any error at step two is a reversible error.  *See Lund*, 2014 WL 1153508, at *26 (collecting cases).  In the absence of clear direction from the Eighth Circuit, the prevailing view of courts in this District has been that an error at step two may be harmless where the ALJ considers all of the claimant's functional limitations as the result of impairments in the evaluation of the claimant's RFC.  *See, e.g., Rosalind J. G. v. Berryhill,* No. 18-cv-82 (TNL), 2019 WL 1386734, at *20 (D. Minn. Mar. 27, 2019) ("Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual

functional capacity."); *David G. v. Berryhill*, No. 17-CV-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); *Tresise v. Berryhill*, No. 16-cv-3814 (HB), 2018 WL 1141375, at *5 (D. Minn. Mar. 2, 2018) ("Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when the ALJ fails to consider the omitted impairments in the RFC."); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity.").  Here, not only is it unclear whether the ALJ addressed fibromyalgia at step two, the RFC determination does not address any functional limitations with respect to the condition, as the ALJ only summarized (in an incomplete matter),[6] when Plaintiff was diagnosed with fibromyalgia. That said, the ALJ does address Plaintiff's allegations of pain.  (R. 18.)  In sum, it is difficult to determine whether any error at step two is harmless, as the ALJ's decision is unclear as to whether the ALJ considered the resulting limitations as part of the Plaintiff's RFC.  In light the fact that the Court is already recommending remand, the ALJ should clarify any functional impact resulting from Plaintiff's fibromyalgia.

---

[6]    By way of example, the ALJ did not consider that on May 23, 2017, Plaintiff was again diagnosed with fibromyalgia and that Dr. Ferron discussed pacing and the need to be able to identify activities that Plaintiff could do  on a daily basis that did not lead to flare ups.  (R. 638.)

F.    **Incontinence**

Plaintiff complains that the although the ALJ found that her dyssynergic defecation was not a severe impairment, the ALJ cited to no evidence or analysis to support that position.  (Dkt. 16 at 17.)  In addition, Plaintiff claims that the ALJ made no severity finding as to her bowel or bladder incontinence and asserts that she would have required unscheduled breaks due to her bowel and bladder incontinence.  (*Id.*)  As argued by Defendants, there is no obligation by an ALJ to cite to specific evidence in support of her conclusions.  *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").  Moreover, there is no indication in the record that Plaintiff's constipation as part of her dyssynergic defecation or her incontinence would require the additional limitation of needing unscheduled bathroom breaks.  In December 2015, Plaintiff denied incontinence.  (R. 412-13.)  It was noted that she had developed incontinence during her 2015 hospitalization (possibly by virtue of a urinary tract infection), but that it had improved as of May 2016, and she denied any stool incontinence.  (R. 365, 465.)  In January 2016, Plaintiff asserted that she did not have the urge to have a bowel movement and would only defecate when she used a suppository.  (R. 465.)  In May 2017, Plaintiff claimed her bladder was improved and only expressed difficulty making it to the bathroom in the morning if she slept all night.  (R. 515.)  While she professed a "few accidents" in 2017 while working part time, in June 2018 Plaintiff asserted that she was "not having as much of a problem with her bowel or bladder."  (R. 519, 672.)  Although

she complained of incontinence to her orthopedic medical provider in 2019, there is no indication that she sought treatment for any incontinence.  (R. 710.)  As such, Plaintiff has not met her burden to show that her RFC should have taken into account the need for unscheduled bathroom breaks.[7]

## V.    <u>RECOMMENDATION</u>

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff Polly O.'s Motion for Summary Judgment (Dkt. 15) be **GRANTED** in part;

2.    Defendant Commissioner Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 17) be **DENIED**;

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation; and

4.    This case be **DISMISSED WITH PREJUDICE**.

DATED: December 16, 2021                     <u>*s/Elizabeth Cowan Wright*</u>
                                                          ELIZABETH COWAN WRIGHT
                                                          United States Magistrate Judge

---

[7]    The Court also notes that the VE testified that the positions relied upon by the ALJ would have ready access to a bathroom that would be close by to workers.  (R. 55.)